UNITED STATES of America, Appellee,

v.

Gary Ray CARROLL, Appellant.

No. 82–5301.

United States Court of Appeals,
Fourth Circuit.

Argued April 15, 1983.

Decided June 22, 1983.

Rehearing and Rehearing En Banc
Denied July 27, 1983.

James L. Nelson, Wilmington, N.C. (Nelson, Smith & Hall, Wilmington, N.C., on brief), Mary E. Lee, Raleigh, N.C. (Nelson, Smith & Hall, Wilmington, N.C., Barbara Ann Smith, Purser, Cheshire, Manning & Parker, Raleigh, N.C., on brief), for appellant.

Margaret I. Miller, Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before RUSSELL and ERVIN, Circuit Judges, and KELLAM,* Senior District Judge.

ERVIN, Circuit Judge:

This is an appeal by Gary Ray Carroll from his conviction following a jury trial in the United States District Court for the Eastern District of North Carolina for attempting to enter a federally insured bank with intent to commit a felony therein in violation of 18 U.S.C. § 2113(a). Finding no merit in any of his assignments of error, we affirm.

I.

At about 2:30 a.m. on July 12, 1982, police responded to a silent alarm set off at a Wilmington, North Carolina, branch of the First National Bank. When the police arrived at the bank, they noticed that the night deposit box was open and that a small black wire was protruding from the bottom of the box. Officer Kidd pulled on the box handle and the box opened. The box ordinarily cannot be opened without a key and the key cannot be removed from the box's lock until the box is closed and relocked. There was no key in the lock. The protruding black wire led to the box's alarm. A bank employee in charge of security devices testified that someone attempted to cut the wire, but shorted it and set off the alarm. That employee also testified that when he arrived at work on the morning of the twelfth, he saw some scratches around the box's lock and that the box appeared to have been pried open.

The police discovered some freshly made footprints near the bank and followed them into the woods. Officer Kidd was one of the officers who followed the path. After about thirty yards, the officers discovered two burlap bags and a piece of copper tubing with a treble hook attached to one end. The police also heard a noise in the woods made by a large animal or person "running through the brush." A bank employee testified that the copper tubing with the attached treble hook could have been used to pull out deposit bags in the vault connected to the night deposit box. The bank had been robbed before in that manner. A later search of the area turned up two crowbars and a flashlight.

At 3:00 a.m., Officer Hickman, a trained dog handler, arrived at the bank. Officer Hickman instructed his tracking dog, Damian, to smell the night deposit box and to track the individual whose scent he smelled on the box. Damian led Hickman to the path leading into the woods and to the location of the two burlap bags and copper tubing. From there, Damian proceeded deeper into the woods to a dense thicket. Damian then indicated that there were at least two suspects who had gone in opposite directions. Hickman and Damian then went a few yards further and the dog indicated that he could smell a suspect nearby. Hickman then halted the search under instructions received over his police radio to go to a nearby parking lot where Carroll was being detained.

---

* Honorable Richard B. Kellam, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

At 3:30 a.m., Carroll approached a sheriff's car that was parked along College Road, about one-quarter mile south of the bank. Carroll had scratches on his face, neck, and hands. His feet and pants below the knees were wet and muddy. Carroll told a deputy sheriff that two men had just attacked him and thrown him into a ditch. The deputy sheriff took Carroll into custody, advised him of his rights, and placed him in the back of the patrol car. Hickman arrived and took Damian to the area where Carroll said the attack had occurred. Damian made no response.

Carroll was taken to the Wilmington Police Station and put into the holding cell, a small room with two backless wooden benches. Detective Lesher stayed with Carroll in the cell from 4:00 a.m. until noon. Carroll slept on a wooden bench from 4:00 a.m. until 8:00 a.m.

At 8:00 a.m., Detective Lesher and F.B.I. Agent Willis began a joint interview of Carroll. Both read him his rights and obtained his signature on waiver of rights forms. Carroll related the following events. He said he lived in Virginia Beach, Virginia, and had driven to Wilmington the previous evening with his two brothers in their automobile. The three arrived in Wilmington around 6:30 p.m., and went to a McDonald's restaurant. Carroll's brothers met two girls there and went to the movies with them. Carroll was to meet his brothers later that evening at the Days Inn Motel. Carroll left McDonald's at about 9:00 p.m. and walked around for an hour until he came across his brothers' car parked behind the New Center Cinema. He then walked around the area for another hour, and at 11:30 p.m. returned to the parking lot, only to discover that his brothers' car was gone. He then walked up New Center Drive toward College Road intending to go to Hardee's restaurant to look for his brothers. As he was walking down College Road, two men whom he did not recognize, jumped out of a drainage ditch, beat him, and pushed him down into the ditch. Carroll climbed out of the ditch and ran toward Hardee's, whereupon he ran into the deputy sheriff. Carroll denied that he had attempted to rob the bank or that he had been near the bank.

Officer Lesher and Agent Willis told Carroll that they did not believe him and pointed out certain implausibilities in the statement. Lesher and Willis went in and out of the holding room during the questioning. At one point, Officer Harris of the Wilmington police entered the holding room and checked Carroll's shoe print. Carroll remarked to Harris "you found my prints there." After being told that there had been similar robberies, Carroll stated that the same people were not responsible for all the robberies. Carroll said he had been involved with the "wrong crowd" and that he was not the only person involved in the attempted bank robbery. When asked to elaborate, Carroll refused, saying he feared for his safety. He also admitted that he had not come to Wilmington with his brothers, but refused to tell with whom he had come.

The interrogation concluded at approximately 12:00 noon and Carroll was taken before a state magistrate and formally charged. Officer Harris then took Carroll's fingerprints. Carroll asked Harris why he smiled when he looked at Carroll's prints. Harris replied that he could not discuss the case and that he always smiled. Carroll then asked Harris about his case and said he knew he did not have much of a chance. Harris allowed that the police had discovered some footprints and fingerprints near the bank. Carroll then told Harris that there had been others with him near the bank.

On the morning of July 13, Officer Hickman and Damian returned to the bank. Hickman let Damian smell Carroll's confiscated trousers and instructed Damian to search the scent. Damian led Hickman into the woods past the spot where the bags and copper tube were found and, at the point where the dog previously had indicated that the trail had split, followed the trail to the right. Damian then indicated that the trail turned back toward College Road. Hickman did not follow the trail through the

woods but took Damian to the area where the deputy sheriff had been parked and Damian indicated that Carroll had exited the woods near where he had approached the deputy's car. Hickman did not follow the trail from the exit point back through the woods to the bank.

None of the footprints found at the scene were later identified as Carroll's. However, soil samples taken from Carroll's clothes matched the soil behind the bank.

On August 17, 1982, Carroll was indicted by a federal grand jury for unlawfully attempting to enter a federally insured bank with the intent to commit a felony therein. Carroll thereafter filed a motion to suppress the statements he had made and any evidence relating to the tracking made by Damian. By order dated October 15, 1982, the motion was denied. On October 27, 1982, the jury returned a verdict of guilty and the district judge sentenced Carroll to twenty years imprisonment. This appeal followed.

## II.

On appeal, Carroll makes three assignments of error: (1) his statements to Lesher and Harris should have been suppressed; (2) the evidence relating to the tracking dog should have been suppressed; and (3) the guilty verdict is not supported by sufficient evidence. We cannot agree.

## A.

Carroll claims that it was error not to suppress the statements he made to Officers Lesher and Harris. He argues that the statements were made under duress, that there was an impermissible delay between his arrest and the time he was brought before a magistrate, and that he was tricked by Harris into making a statement.

■ Whether an admission is voluntary or induced by duress or coercion is to be determined from the totality of circumstances, including the setting in which the statement was obtained, the details of the interrogation, and the characteristics of the accused (*i.e.,* his age, education, experience, and intelligence). *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Wertz,* 625 F.2d 1128, 1133–34 (4th Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980). The circumstances cited by Carroll are his lack of sleep, the denial of medical care, the denial of food, and the intimidating atmosphere of the stark holding cell. Those circumstances do not warrant a finding of involuntariness.

Carroll was able to sleep for several hours and was questioned for only four hours. He was not beaten or threatened. Although he suffered scratches on his skin, those scratches were superficial and there is no evidence that he requested or needed medical attention. Nor is there any indication that Carroll requested or was denied food, water, or use of the toilet. Carroll was 26 years old. He had completed the eleventh grade and could read and write. Furthermore, he was advised of his rights on three occasions by three different officers and had signed two written waiver forms.

■ Carroll suggests that there was an impermissible delay between the time of his arrest (3:30 a.m.) and the time he was brought before the magistrate (12:00 noon). He concedes, however, that Fed.R.Crim.Pro. 5(e) is not applicable to his state arrest. Furthermore, there is no evidence that the delay was pursuant to a working arrangement between state and federal authorities designed to thwart the rule. *See United States v. Torres,* 663 F.2d 1019, 1024 (10th Cir.), *cert. denied,* 456 U.S. 2237, 102 S.Ct. 2237, 72 L.Ed.2d 847 (1982). Carroll nevertheless contends that the delay evidences the lack of appropriate safeguards for his rights. While the delay was unfortunate, it does not, when viewed in light of the totality of the circumstances, require a finding of involuntariness.

■ Carroll's claim that Officer Harris tricked him into making incriminating remarks is not supported by the evidence. That Harris smiled when he looked at Carroll's prints does not make Harris's "words

or actions" the "functional equivalent" of an "interrogation" under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). In fact, Harris explained to Carroll that he always smiled a lot and told Carroll that he could not discuss the case with him. Only after Carroll continued to question Harris did Harris allow that the police had found some—but not specifically Carroll's—footprints near the bank. It was at that point that Carroll volunteered that others had been with him near the bank. That statement cannot be viewed as the product of a *Miranda* interrogation.

### B.

Carroll next argues that the evidence relating to the tracking by Officer Hickman and the dog, Damian, should not have been admitted because the prosecution did not establish a proper foundation. Carroll contends that the evidence was unreliable because Damian did not have a sufficiently successful tracking record, the trail Damian followed had been contaminated by the police, Damian never followed the complete trail, and Hickman did not allow Damian to smell Carroll when he was taken into custody by the deputy sheriff.

■ Officer Hickman testified that he and Damian successfully had completed a 10-day detection and tracking training course, that he and Damian practiced tracking at least three times a week, that he and Damian previously had worked on about 17 to 25 cases, and that Damian successfully had tracked objects and people on hundreds of prior occasions in training sessions and in actual police work. That testimony established a proper foundation for the evidence.[1]

Furthermore, there were sufficient indicia of reliability regarding the particular trackings here. Hickman testified that conditions surrounding Damian's tracking on the morning of July 13, the day after the attempted robbery, were favorable; that when the air and ground warm up in the morning all scents follow the rising warm air currents, making a trail easy to follow. For the July 13 search, Damian scented only Carroll's trousers so it could not be that he was following the scent of an officer who had walked the trail before. Furthermore, Damian went further into the woods than had Officer Kidd, the only one who could have contaminated the previous morning's tracking by virtue of having touched the box that Damian scented. It is notable that Damian followed the same trail he tracked the previous morning, except as one would expect, that he broke only in one direction at the point where he previously had indicated that the suspects had split up.

While the tracking evidence would have been more convincing if Hickman had let Damian track the complete trail, that failure does not make the evidence inadmissible. The trail was tracked to a point where it turned toward College Road and Damian indicated that he detected Carroll's scent at the edge of the woods near the area on College Road where Carroll approached the deputy's car.

It is also significant that Carroll had the opportunity to cross-examine Hickman and

---

1. Carroll has argued that it was error for the district court to quash his subpoena of Damian. Carroll sought "to put the dog on the stand" and "to try to talk to the dog" so that "the jury personally could view the dog and judge its appearance for signs of intelligence, training and good breeding." Carroll claims that he was denied his sixth amendment right of confrontation. This claim has been rejected by the courts on the basis that the witness is not the dog, but rather the handler. *See, e.g., State v. Barger,* 612 S.W.2d 485 (Tenn.Cr.App.1980). Carroll nevertheless argues that some worth-while purpose could have been served by having the dog present in the courtroom for evaluation by the jury and, perhaps, for testing in front of the jury. The dog's reliability, however, adequately was attested by requiring its handler, Hickman, to establish a foundation for his testimony. Where, as here, the handler testifies that the dog successfully has completed a training course, practices several times a week, and successfully has completed hundreds of tracking exercises, no purpose is served by having the dog appear before the jury to perform a set of tests.

to argue to the jury the points he now raises concerning the probativeness of Hickman's testimony. Once an adequate foundation was established and the threshold of reasonable reliability passed, admission of that testimony was proper and it was sufficient for Carroll to have the opportunity to attack the testimony's probativeness.[2]

### C.

In reviewing the evidence, this court must examine the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). So viewed, the evidence was sufficient to establish that Carroll attempted to rob the bank, *i.e.,* took a "substantial step" toward commission of the offense. *See United States v. Manley,* 632 F.2d 978, 987 (2d Cir.), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1980).

■ The evidence showed that the robbers forced open the lock to the night deposit box, fished out a wire connected to the bank's alarm system, and attempted to cut the wire in order to silence the alarm. The robbers had with them tools to remove deposits from the vault. The robbers did not voluntarily give up the crime; they fled into the woods upon hearing the police, who were tipped by the silent alarm. In their haste, the robbers dropped the implements of the crime. Indeed, the first officer to search the woods heard one of the robbers running through the brush. The evidence establishes a substantial step toward the commission of the offense.

Sufficient evidence connects Carroll with the attempt. The dog tracked Carroll into the woods from the bank past the point where the implements were dropped and back toward College Road, where Carroll approached the deputy. Soil samples taken from Carroll's clothes matched the soil behind the bank. Carroll had scratches that indicated he had run through a thicket. His story was implausible since he said he began to walk toward Hardee's at 11:30 p.m., but approached the police car, which was only one-half mile from his starting point, at 3:30 a.m. It should not have taken Carroll four hours to walk one-half mile. Carroll told an officer that he was involved with the wrong crowd and that others had been involved in the attempt. This evidence is sufficient to establish Carroll's involvement in the attempted robbery.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

2. Carroll also argues that the district court erred by failing to warn the jury not to give undue weight to the dog tracking evidence. Carroll claims that the district court should have given the instruction, *sua sponte,* when the jury requested the transcript of the tracking evidence. Because Carroll failed to request such an instruction, however, he has waived his objection to its omission, absent plain error. *See* Fed.R.Civ.Pro. 52(b); *United States v. McCaskill,* 676 F.2d 995 (4th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982). While such an instruction clearly would have been appropriate, neither this court nor any other court has ever held that the failure to give such instruction is plain error. *See Barger,* 612 S.W.2d at 493 (not plain error to fail to give warning instruction concerning dog tracking evidence). Furthermore, the jury was instructed to consider all the evidence in the case and to give the expert testimony only such weight it deemed it to deserve. Carroll cross-examined Hickman and in his closing arguments to the jury attacked the probative value of the tracking evidence. Considering the jury instructions as a whole and Carroll's attack on the evidence, it was not plain error not to instruct the jury about giving undue weight to the tracking evidence.