PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SERGIO JIMENEZ, as personal
representative of the estate of the
late Sergio Hernandez Jimenez II,
　　　　　　　　*Plaintiff-Appellee,*

v.

DAIMLERCHRYSLER CORPORATION,
　　　　　　　　*Defendant-Appellant.*

ALLIANCE OF AUTOMOBILE
MANUFACTURERS; PRODUCTS LIABILITY
ADVISORY COUNCIL, INCORPORATED;
PUBLIC CITIZEN, INCORPORATED;
CENTER FOR AUTO SAFETY,
　　　　　　　　*Amici Curiae.*

No. 00-1021

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Falcon B. Hawkins, Senior District Judge.
(CA-96-1269-2-11)

Argued: March 1, 2001

Decided: October 19, 2001

Before NIEMEYER, LUTTIG, and WILLIAMS, Circuit Judges.

---

Reversed in part and vacated and remanded for a partial new trial by
published opinion. Judge Niemeyer wrote the opinion for the court
except with respect to Part IV.B. Judge Luttig wrote the opinion for
the court on Part IV.B, in which Judge Williams joined and on which
Judge Niemeyer dissented.

---

## COUNSEL

**ARGUED:** Theodore B. Olson, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Appellant. John Calvin Jeffries, Jr., UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Theodore J. Boutrous, Jr., Thomas H. Dupree, Jr., GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C.; David R. Tyrrell, Robert M. Fulton, HILL, WARD & HENDERSON, Tampa, Florida; Wade H. Logan, III, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Charleston, South Carolina, for Appellant. Richard A. Simpson, Charles I. Hadden, Lynda Guild Simpson, ROSS, DIXON & BELL, L.L.P., Washington, D.C.; David G. Owen, Columbia, South Carolina; Reese I. Joye, Mark C. Joye, JOYE LAW FIRM, North Charleston, South Carolina, for Appellee. Anthony H. Anikeeff, ALLIANCE OF AUTOMOBILE MANUFACTURERS, Washington, D.C.; Christopher Landau, Jay P. Lefkowitz, Daryl Joseffer, Ashley Parrish, KIRKLAND & ELLIS, Washington, D.C., for Amicus Curiae Alliance. Griffin B. Bell, Chilton Davis Varner, Paul D. Clement, KING & SPALDING, Atlanta, Georgia; Hugh F. Young, Jr., PRODUCT LIABILITY ADVISORY COUNCIL, INC., Reston, Virginia, for Amicus Curiae Council. Alison Van Horn, Michael Quirk, Brian Wolfman, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Amici Curiae Public Citizen and Center.

---

## OPINION

NIEMEYER, Circuit Judge, writing for the court except in Part IV.B:

The Estate of 6-year old Sergio Jimenez II ("young Sergio") commenced this product liability action against DaimlerChrysler Corporation ("DaimlerChrysler"), alleging that DaimlerChrysler negligently designed the rear liftgate latch on its 1985 model Dodge Caravan, permitting it to open during an accident. As a result of an accident on April 10, 1994, young Sergio was thrown from a 1985 Dodge Caravan through the open liftgate and killed. A South Carolina jury awarded the Estate $12.5 million in compensatory damages (remitted by the district court to $9 million) and $250 million in punitive dam-

ages. On appeal, we reverse the jury's verdict finding liability for negligent misrepresentation and awarding punitive damages; and we vacate the judgment, and we remand for a new trial on the claims for negligent design and strict liability. Our reasons follow.

I

In early 1994, Sergio Jimenez ("Jimenez"), young Sergio's father, purchased a used 1985 Dodge Caravan from a used car dealer in North Charleston, South Carolina. A few months later, on April 10, his wife, Denise Barrientos, was driving the vehicle on an errand with her 8-year old daughter Maria riding in the front seat and young Sergio in the back seat. As Barrientos exited a shopping center parking lot, she drove through a red light and was struck in the left rear by an oncoming car traveling at 30 m.p.h. The impact caused Barrientos' vehicle to flip over and spin around. Young Sergio, who was not wearing a seatbelt, was thrown through the rear liftgate that had opened during the accident. He sustained fatal injuries. Barrientos and Maria, both of whom were wearing seatbelts, were not seriously injured. Young Sergio's Estate sued Barrientos for negligence in running the red light and settled with her for $15,000, the limit of her insurance coverage. The Estate then commenced this action against DaimlerChrysler, relying on diversity jurisdiction, and three of its claims — those for strict liability, negligent misrepresentation, and negligent design under South Carolina law — were allowed to go to the jury. Following a four-week trial, the jury returned a verdict finding in favor of the Estate on all three claims and awarding it $12.5 million in compensatory damages and $250 million in punitive damages. The district court remitted the compensatory damage award to $9 million.

At trial, the Estate contended that DaimlerChrysler's 1985 Dodge Caravan included a defectively designed rear liftgate latch, which caused the liftgate to open during the accident. The Estate asserted that "Sergio would not have been seriously injured had he not been ejected from the vehicle, and he would not have been ejected, regardless of seatbelt use, if the rear door latch had not been defective." DaimlerChrysler agrees that if it had included a *headed* striker post in its liftgate latch, the liftgate would not have opened and Sergio would not have been thrown from the vehicle. Outlining its case

against DaimlerChrysler for punitive damages, counsel for the Estate told the jury:

> [W]hat makes this case so tragic is that that latch had been known by Chrysler to be defective for more than ten years, and it was in 1.6 million minivans. And the evidence will show they knew it. With their guilty knowledge, they not only did not tell the public about it, they did not offer to fix it, and they ultimately destroyed documents that reflected their guilt and continued to cover it up.

J.A. 81-82.

The vehicle involved in the accident, the Dodge Caravan, was the first "minivan." At the time it was introduced in 1984, its design was unique. The popularity of minivans generated extraordinary sales, so that by 1994, DaimlerChrysler's profits from minivan sales accounted for 46% of its total profits. Although the liftgate latch design was changed in 1988, the design for the latch that was included in the 1985 model was the same as that included in the original 1984 model.

At the time the Caravan was originally designed, there was no federal safety standard applicable to latches on trunks, rear doors, or rear "liftgates." Federal Motor Vehicle Safety Standard 206, which had been promulgated by the National Highway Transportation Safety Administration ("NHTSA") and was applicable to the early minivans, specified minimum strength and design standards for latches used in *passenger doors* to prevent passenger ejections resulting from doors opening during accidents. But that standard did not apply to any trunk or other rear door. In designing the 1984 Caravan, DaimlerChrysler elected to install a latch for the liftgate similar to that which it had used on internal trunks. This latch contained a vertical striker post that was not as strong as a passenger door latch striker post and that did not contain a head on the top of the post to prevent the latching mechanism from riding up and off of the striker post.[1] The DaimlerChrysler engineer who designed the latch testified at trial:

---

[1]The striker post was approximately one-and-a-half inches long and was mounted vertically on the sill of the opening at the rear of the vehicle. This post connects with the latch mechanism contained within the liftgate. When the liftgate is shut, the latch closes around the striker post, thereby fastening the liftgate to the body of the vehicle.

[W]e designed this latch to our performance standard. We tested it to the performance standard. We put it in vehicles, and we, and this history of the performance standard has been over a number of years. The latch design has been a generation of over a hundred, of over years, and we have a good understanding of the latch and a good record of that type of latch.

J.A. 321-22. He explained that a headless striker post was selected because it was being used on the sill of a cargo door, and a headed striker might "hang up the cargo boxes or whatever you slid in on the floor back." J.A. 324, 310.

DaimlerChrysler acknowledged that it performed no crash tests to determine how the minivan latch would perform in an accident, and during discovery, it acknowledged that "the Chrysler latch was noticeably flimsy versus" the latches of competing minivans that came on the market soon thereafter. While DaimlerChrysler conducted no crash tests to determine how the liftgate latch would perform in accidents, it did have fuel-integrity crash test videotapes and data. But these were destroyed in October 1988. These videotapes included tests showing minivans hit from the left side, the type of crash that the Estate contends was the most likely to cause liftgates to pop open unexpectedly. What the videotapes actually showed, however, is unknown. DaimlerChrysler attributed the destruction of the videotapes and records relating to latch changes to its established document retention program. Under that program, such records would have been retained only for vehicles that were the subject of litigation. The Estate maintained that the destruction of the tapes and documents was part of a coverup to protect DaimlerChrysler from an expensive recall, litigation, and adverse publicity.

In August 1985 and January 1986, DaimlerChrysler received its first reports of liftgates opening following collisions, and within the next ten years, the NHTSA became aware of 207 alleged crash-related liftgate openings that resulted in a reported 134 ejections through liftgate openings. In the middle of the 1988 model year, DaimlerChrysler changed its minivan design to incorporate a headed striker. Although DaimlerChrysler's standard business practice required management approval of a mid-year model change, Daimler-

Chrysler's representative at trial testified that no one currently at DaimlerChrysler knows why it changed to a headed striker and that there are no documents still in existence describing the reason for the change.[2] During this same 1988 time period, DaimlerChrysler internally debated its liftgate latch design's possible defectiveness but decided not to make any further change. In fact, it fired a safety engineer who had repeatedly advocated making the latch safer.

DaimlerChrysler never disclosed potentially relevant information regarding its Dodge Caravan and the liftgate latch to NHTSA, and this lack of disclosure, the Estate contends, might have affected the outcome of NHTSA's decision in 1990 not to extend side-door latch standards to liftgates. NHTSA did, however, eventually extend side-door latch standards to liftgates and other rear doors in late 1994.

At trial, the jury found that DaimlerChrysler was negligent in designing the liftgate latch and that it negligently misrepresented the safety of its minivans. It found that DaimlerChrysler's conduct was "reckless, willful, or wanton" and that it acted "with conscious failure to exercise reasonable care." Based on these findings, it awarded the Estate punitive damages.

---

[2]The Estate sought to expand the safety issue in this case beyond the headless striker issue to include the latch's overall "flimsiness." But this effort appears more to justify the admission of post-design conduct by DaimlerChrysler in the late 1980s and early 1990s than to support the relevant negligence claim based on the design of the latch. The Estate's expert witness testified that the striker post's flimsiness did permit the post to bend "some" and thereby facilitate the latch's riding up the post on its course to coming apart. But the expert concluded that even with the bending that did occur, the bending was not the functional cause of the failure in this case. He stated, "the bottom line is, [the striker post] doesn't have a cap." Asked to explain, the expert stated:

    Q.   Mr. McCracken, if that latch had been used with a striker with a head, would the door have opened in this accident?

    A.   No. I think that's one of the few things that we can agree. Even the defendant's expert says, if the latch had had a head, it does not come open.

J.A. 257.

From the entry of judgment, DaimlerChrysler noticed this appeal, contending, among other things, (1) that the evidence presented at trial was legally insufficient to support the jury's finding of liability on the negligent misrepresentation claim; (2) that the Estate failed to introduce "clear and convincing" evidence sufficient to justify an award of punitive damages; and (3) that some of the district court's evidentiary rulings — those excluding evidence of Barrientos' negligence in running the red light, excluding evidence of young Sergio's failure to wear a seatbelt, and admitting evidence of other liftgate-latch accidents — were erroneous and prejudicial, entitling it to a new trial.

## II

The jury returned a verdict finding DaimlerChrysler liable on each of three theories of liability — strict liability in tort, negligent design, and negligent misrepresentation. On the first two claims, Daimler-Chrysler does not contend that the evidence was insufficient to support the verdicts. Rather, on those two claims, as discussed in Part IV, it argues for a new trial based on evidentiary rulings made by the district court. On the third claim — negligent misrepresentation — DaimlerChrysler contends that the evidence was insufficient to support the verdict. It is this contention that we address first.

At trial, the Estate claimed that DaimlerChrysler was liable for negligent misrepresentation based on its advertising that the minivan was a safe vehicle. As the Estate states in its brief:

> As to making a false statement, CEO Eaton testified that Chrysler "advertise[d] safety on all its vehicles," sold minivans with "promises of safety," and that people had a "right" to expect safe vehicles. Sergio's mother saw Chrysler's minivan advertisements touting safety. Such "promises" and advertisements are false statements when the speaker knows the vehicle contains a safety defect.

Brief for Appellee at 34-35 (internal citations to the J.A. omitted). DaimlerChrysler acknowledged that it generally advertised the safety of its vehicles. But the entirety of the evidence relating to any negli-

gent misrepresentation made to young Sergio's mother or father consisted of the following direct testimony of young Sergio's mother:

> [Lawyer].     All right. What got you to decide — well, first of all, was there any particular minivan that you were looking at?
>
> [Barrientos].  *I had seen some commercials on Chrysler Caravans.*
>
> [Lawyer].     Okay. And what do you remember specifically about the Caravan?
>
> [Barrientos].  I remember seeing — just the usual things, like the mileage, that they were good on gas. I liked when they would show the sliding door. I liked the idea of a sliding door versus a door that opens, you know, this way. (Indicating). *That they were safe.*

J.A. 554 (emphasis added). Barrientos did not testify precisely when she saw these commercials or to what model year Caravan they referred. It is clear only that she saw the commercials a short time before Jimenez purchased the 1985 model Caravan in early 1994.

Under South Carolina law, to prove a claim for negligent misrepresentation, the plaintiff must establish that (1) the defendant negligently made a false statement, (2) the plaintiff suffered an injury or loss as a consequence of relying on the misrepresentation, and (3) the misrepresentation induced the plaintiff to enter into a contract or business transaction. *See Evans v. Rite Aid Corp.*, 478 S.E.2d 846, 848 (S.C. 1996); *Gilliland v. Elmwood Props.*, 391 S.E.2d 577, 580 (S.C. 1990).

In the case before us, the evidence does not support the jury's finding that representations made about the Dodge Caravan's safety in the commercials seen by Barrientos were false or, even assuming their falsity, that Barrientos relied on them. Indeed, there was no evidence that DaimlerChrysler ever made a safety representation with respect

to the 1985 model purchased by Barrientos' husband. Rather, Barrientos' testimony suggests that she viewed the commercials she mentions shortly before her husband bought the used minivan in early 1994. Thus, there is no evidence that any safety representations made in commercials broadcast in the early 1990s were false because they would have referred to the vehicles depicted in those advertisements, which were much more recent model year vehicles than the nine-year old Dodge Caravan purchased by Barrientos' husband. For similar reasons, the reliance element was not satisfied. At most, a jury could have concluded that young Sergio's death resulted from his *mother's* reliance upon a representation made about a current model-year Caravan when his injury was caused by a defect in a nine-year-old vehicle purchased by his *father*.

The Estate contends that even if the proof of an affirmative misrepresentation based on advertising was insufficient, that failure is not fatal to its negligent misrepresentation claim because, under South Carolina law, a *failure to disclose* may also be the basis for a finding of negligent misrepresentation. *See generally Landvest Assocs. v. Owens*, 274 S.E.2d 433, 434 (S.C. 1981) ("Suppression of a material fact which one is duty bound to disclose is equivalent to a false misrepresentation"); *Ardis v. Cox*, 431 S.E.2d 267, 270 (S.C. Ct. App. 1993) ("Nondisclosure is fraudulent when there is a duty to speak"). The Estate argues that federal law imposes a duty to disclose defects in motor vehicles, *see* 49 U.S.C. §§ 30118-30120, and that this duty forms a basis of its state misrepresentation claim. But this argument fails to recognize that the South Carolina courts have made clear that a duty to disclose arises in only three circumstances:

> (1) where . . . [there exists] a preexisting definite fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties.

*Ardis*, 431 S.E.2d at 270. None of the three circumstances described in *Ardis* is present in this case, and certainly none involves a common-law duty of disclosure arising out of a statutory duty, much less one arising from a federal statute that does not provide a private cause of action for its enforcement.

In addition to facing these fatal limitations imposed by South Carolina law, the Estate cannot employ such a misrepresentation theory in this appeal for the further reason that the issue of whether there was a failure to disclose was never presented to the jury. The jury was instructed only on the law of affirmative misrepresentation, and the Estate failed to request an additional instruction on the law of fraudulent failure to disclose. When the party asserting a legal theory could have requested a jury instruction on an alternate theory but did not, the argument that a jury charge which instructed on such a theory would have been valid becomes unavailable on appeal. *See Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449-50 (6th Cir. 2000); *id.* at 457 (Guy, J., dissenting); *Abel v. Miller*, 824 F.2d 1522, 1535 (7th Cir. 1987); *cf. United States v. Carroll*, 710 F.2d 164, 169 n.2 (4th Cir. 1983); *Lloyd v. Lloyd*, 154 S.E.2d 428, 428 (S.C. 1967). Thus, if the jury were following the court's instructions, as we must presume, it did not base its verdict on a nondisclosure theory, and we cannot at this stage consider an argument about what the jury could have or would have done had the issue been presented to it.

Because the evidence presented was insufficient to establish a negligent misrepresentation claim under South Carolina law, we reverse the jury's verdict on that claim and direct the district court to enter judgment on that claim in favor of DaimlerChrysler.

III

DaimlerChrysler next contends that under the remaining counts of negligent design and strict liability, the evidence was insufficient to justify an award of punitive damages. The jury found that DaimlerChrysler was "reckless, willful, or wanton and was acting with conscious failure to exercise reasonable care" and awarded the Estate $250 million in punitive damages.

The Estate advances two distinct arguments to support the punitive damage award. First, it argues that evidence of DaimlerChrysler's contemporaneous disregard for safety when it designed the liftgate latch justified the award. It states that DaimlerChrysler "cut corners on important safety issues" by using a performance standard for trunks rather than passenger doors. Not only did it select a striker post that was "more flimsy" than what was used by others in the industry for liftgates, but it also elected to use a headless striker post "to accommodate a trivial marketing concern about packages catching on the tiny head of a striker." Brief of Appellee at 49. Finally, the Estate points to the fact that DaimlerChrysler conducted no crash tests to observe the performance of the latch in accidents.[3] Relying on the aggregate of these facts, the Estate characterizes DaimlerChrysler's design as reckless, permitting a jury to infer a consciousness of wrongdoing in the 1984-85 period when it designed and sold Jimenez's minivan.

Second, the Estate contends that in any event post-design conduct reveals a consciousness of wrongdoing that relates to the 1984-85 period for which the jury could have properly awarded punitive damages. It argues:

> [T]he jury reasonably could have found that Chrysler officials consciously put safety concerns aside to accommodate the marketing group and to bring a new product quickly to market. Shortly after the first minivans were sold, Chrysler began receiving reports of ejections, deaths, and devastating injuries. At that point, Chrysler was in a bind, since to do what law and decency required — recall the minivans and fix the defects — would have resulted in large adverse judgments in pending product defect litigation, the huge expense of a recall, and a public relations disaster involving the company's flagship product.

---

[3]The Estate also argues that the use of a headless striker was reckless in 1984 because "headed strikers had been the industry safety norm for at least twenty years." Brief of Appellee at 49. But even the Estate concedes that the liftgate was not a side passenger door and that "the minivan was unlike any previous vehicle [so that] there was no federal standard in place for the latch on its unique rear door." *Id.* at 49 n.14.

Faced with this prospect, Chrysler chose to hide the defect and destroy evidence. It secretly switched to a headed striker and destroyed all documents concerning reasons for the change, as well as the crash test videos and documents generated when the latch originally was designed. As time passed and deaths, injuries, and lawsuits mounted, the cost of disclosing and fixing the defect — in lost sales, cost of recall, bad publicity, and adverse judgments — mounted, too. Chrysler therefore grew increasingly desperate to hide the defect, and its conduct became increasingly reprehensible.

Brief of Appellee at 52-53.

DaimlerChrysler contends that no evidence contemporaneous to the 1984-85 period establishes clearly and convincingly that Daimler-Chrysler was conscious of any wrongdoing to justify an award of punitive damages. It argues:

Plaintiff did not offer any evidence that [DaimlerChrysler] was conscious in 1985 that the vehicle was unreasonably dangerous because of the headless striker or any other feature. Emerson Krantz, [DaimlerChrysler's] chief latch engineer, was the only trial witness who had been involved in the design of the latch. He testified that the latch was designed to meet an internal [DaimlerChrysler] performance standard "that provided a satisfactory latch." According to Mr. Krantz, "based on our testing and our design [the use of a headless striker] wasn't a problem." Thus, the *only* evidence relating to [DaimlerChrysler's] state of mind at the time of the design and manufacture of Jimenez minivan established that [DaimlerChrysler] believed the latch to be "satisfactory." Nor did plaintiff offer evidence of a *single other incident* — before or after the manufacture of the Jimenez vehicle — in which a headless striker caused injuries.

Brief of Appellant at 14-15 (internal citations to the J.A. omitted). DaimlerChrysler points additionally to the facts that it pioneered the minivan and that its choice of the headless striker was consistent with

the foreseen use of the rear portion of the van as cargo space. It argues that for good policy reasons, "courts must take care not to inflate a case of carelessness into one of wanton disregard." *Id*. at 13.

And with respect to post-design conduct, DaimlerChrysler asserts that the evidence was not relevant to DaimlerChrysler's state of mind at the time it designed the minivan. It argues that none of the post-design conduct suggests that DaimlerChrysler was conscious of wrongdoing in designing the minivan in 1984. Rather, it contends that the evidence demonstrates its innocent state of mind.

Under South Carolina law, punitive damages may be awarded to punish only those tortfeasors who have acted in a "reckless, willful, or wanton" manner. *Taylor v. Medenica*, 479 S.E.2d 35, 45 (S.C. 1996). Assessment of punitive damages for recklessness is proper only if the wrongful "act is committed in such a manner that a person of ordinary prudence would say that it was [in] reckless disregard of another's rights." *Hicks v. McCandlish*, 70 S.E.2d 629, 631 (S.C. 1952). Punitive damages are designed to punish only behavior that was obviously reckless at the time of commission. *See Rogers v. Florence Printing Co.*, 106 S.E.2d 258, 263 (S.C. 1958) (explaining that punitive damages are appropriate only when a tortfeasor, at the time of his malfeasance, "would *then* have been conscious of it as an invasion of the plaintiff's rights" (emphasis added)).

The basis for an award of punitive damages must be proved by "clear and convincing evidence." S.C. Code Ann. § 15-33-135. And "clear and convincing" has been defined as "evidence . . . of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established," *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. Dist. Ct. App. 1983), *quoted with approval by Anonymous v. State Bd. of Med. Exam'rs*, 473 S.E.2d 870, 878 (S.C. Ct. App. 1997), *rev'd on other grounds*, 496 S.E.2d 17 (S.C. 1998), and, as well, as evidence that proves the facts at issue to be "highly probable," *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, *Evidence* § 2498 (3d ed. 1940) (internal quotation marks omitted)).

Accordingly, in this case we must determine whether the jury was presented with evidence that showed it was highly probable that

DaimlerChrysler acted in a willful, wanton, or reckless manner at the time of the conduct supporting the claims of negligent design or strict liability — i.e., during the 1984-85 period when the liftgate latch was designed and when the Caravan was delivered from the factory. We need not consider evidence proffered in favor of negligent misrepresentation because we have already determined that, as a matter of law, DaimlerChrysler may not be held liable to the Estate under that theory.

We have little difficulty concluding first that the evidence of conscious wrongdoing *contemporaneous* to the 1984-85 period is lacking. DaimlerChrysler pioneered the minivan, creating a novel and popular vehicle that combined passenger and cargo areas with easy access to both. The question whether the rear liftgate was a cargo door or a passenger door for safety purposes was not settled by existing standards or practices at that time. And when selecting a latch for the liftgate, the DaimlerChrysler engineers rationally viewed the liftgate as a cargo door providing access to cargo space storage. They accordingly chose to use a trunk-type striker post. For a similar reason, the engineers excluded a head on the striker post to accommodate cargo better. The latch thus designed met DaimlerChrysler's own performance standards for trunks, which, up to that time, had never presented a problem for DaimlerChrysler or its customers. And when DaimlerChrysler did learn within the first few years that the latch would permit the liftgate to open, it responded accordingly by adding a head to the striker post in 1988.

There is no evidence in the record that DaimlerChrysler or any engineer in the industry recognized during the 1984-85 time period that using a trunk latch for the liftgate of the minivan could create a safety problem. While there is evidence that competitors were using a passenger door-type latch for the rear gate during approximately the same period, there was no suggestion that this was either an industry standard or that it was required for any then-perceived safety problem. Even though a review of the designer's judgments following subsequent accidents does permit an evaluation of the conduct in a more focused light, it can justify at most in this case the finding that those judgments were negligent. It does not permit the conclusion that the DaimlerChrysler engineer acted in reckless disregard of any known fact or, more specifically, in reckless disregard of the safety

of passengers who would be riding in the seats forward of the cargo space.

The Estate argues more forcefully, however, that the *post-design* conduct relates back to prove consciousness of wrongdoing, just as would any coverup, flight from an arrest, or flight from an accident. But to succeed in this effort, the Estate must establish that the post-design conduct clearly and convincingly points to DaimlerChrysler's consciousness of wrongdoing *at the time it designed the minivan and the liftgate latch* and not to consciousness of wrongdoing thereafter, such as a wrongful failure later to initiate a recall. A closer review of the evidence in the record indicates that the post-design evidence does not evince DaimlerChrysler's contemporaneous consciousness of wrongdoing but rather a consciousness of wrongdoing *after* the design error was discovered.

The most temporally relevant post-design evidence is that relating to DaimlerChrysler's conduct in 1988, when it made the mid-model year change to include the head on the striker post and destroyed the fuel integrity crash videotapes and other data relating to its design of the liftgate latch. But this evidence points to a post-design *discovery* of a problem as opposed to knowledge of the problem when the latch was designed. The allegedly secretive switch in 1988 to a *headed* striker could only indicate a *realization* that the previous latch design was unsafe, not that DaimlerChrysler knew it misdesigned the latch in the first place. Had DaimlerChrysler realized a design mistake before it completed its design of the latch in 1984, logic compels the conclusion that the switch to a headed striker post would have been made then, and not in 1988. There appears to be no logical reason — and the Estate has not suggested one — why DaimlerChrysler would have suddenly started using a headed striker in the middle of the 1988 model year had the need for such a change been so clear at the time of original design.

Rather than indicating a consciousness of wrongdoing in 1984, therefore, the evidence of a change in 1988 points only to a *discovery made subsequent to* the initial design. This conclusion is further buttressed by the evidence in the record that DaimlerChrysler did not receive its first complaints about the liftgate's coming open in collisions until August 1985 and early 1986. Moreover, even up until the

time that it made the change in 1988 to include a headed striker post, DaimlerChrysler had not been made aware of any injury resulting from the headless striker post. Thus, the cover-up evidence actually undermines the Estate's argument that DaimlerChrysler was conscious of wrongdoing at the time the design was being completed. Indeed, the Estate appears to acknowledge this when it argues that "*after the first minivans were sold*, Chrysler *found* itself in a bind." Brief of Appellee at 52 (emphasis added). It was only *at that point* that DaimlerChrysler failed to do what "law and decency required — recall the minivans and fix the defect." *Id*. When DaimlerChrysler learned of a defect in its original design, it arguably acted improperly in response to that discovery by covering up and destroying evidence. But even were that so, such a response does not demonstrate that at the time of the conduct forming the basis of the negligent design and strict liability claims (1984 and 1985), it knew the latch to be a problem.

Because the evidence advanced by the Estate failed to demonstrate clearly and convincingly a consciousness of wrongdoing at the time of the tortious conduct at issue, the Estate has failed to meet the "clear and convincing" standard required by South Carolina law. Accordingly, we reverse the jury's verdict awarding punitive damages and direct the district court to enter judgment in favor of DaimlerChrysler on the Estate's claim for punitive damages.

IV

In connection with the jury's findings of liability for negligent design and strict liability, DaimlerChrysler asserts that the district court should have ordered a new trial because several of the district court's evidentiary rulings rendered the verdict unreliable. It cites, in particular, four rulings: (1) the exclusion of evidence that Barrientos ran a red light, causing the accident, on the ground that "[c]ar manufacturers should expect that the vehicles they design and build will be involved in accidents which will be someone's fault" and therefore the question of "why the initial collision occurred is not relevant"; (2) the exclusion of evidence that young Sergio was not wearing his seatbelt on the ground that "any evidence on the use or nonuse of seatbelts for the purpose of proving contributory negligence, failure to minimize damages, or fault would be inappropriate in light of [*Keaton*

*v. Pearson*, 358 S.E.2d 141 (S.C. 1987)]"; (3) the exclusion of evidence that the Estate made a claim against Barrientos for negligence in causing the accident and settled that claim for $15,000, on the ground that evidence relating to the cause of the accident, as distinct from the cause of the enhanced injury, was irrelevant; and (4) the admission of evidence of other accidents involving latch failures in DaimlerChrysler minivans, "regardless of the failure mode." J.A. 66-67, 68, 75.

DaimlerChrysler contends that these rulings were not only erroneous but also "left the jury with a grossly distorted picture of this case that was deeply prejudicial to [DaimlerChrysler]." DaimlerChrysler argues that the "combined effect of these rulings prevented the jury from knowing the truth and allowed plaintiff to force-feed the jurors a story that amounted to fiction."

We address these rulings in turn.

A

The Estate's theory of liability was that DaimlerChrysler designed and sold a defective product that did not, in this case, cause the accident, but rather caused an enhanced injury when the car was involved in an accident — an injury from the so-called "second collision." *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1069 n.3 (4th Cir. 1974). Under the crashworthiness doctrine, liability is imposed not for defects that cause collisions but for defects that cause injuries after collisions occur. *See Mickle v. Blackmon*, 166 S.E.2d 173, 185-87 (S.C. 1969). Accordingly, evidence about the cause of the original accident is not relevant. *See id.*; Thomas V. Harris, *Enhanced Injury Theory: An Analytic Framework*, 62 N.C. L. Rev. 643, 673 (1984) ("In enhanced injury [crashworthiness] cases, . . . a claimant's fault in causing the accident is not a basis for reducing his recovery. . . . [A] manufacturer's duty is that of minimizing the injurious effects of contact however caused").

DaimlerChrysler argues that because South Carolina has adopted the doctrine of comparative negligence — whereby the plaintiff's recovery is reduced in proportion to the amount of his or her negligence, *see Nelson v. Concrete Supply Co.*, 399 S.E.2d 783, 784 (S.C.

1991) — Barrientos' responsibility for the original accident is relevant to the amount of recovery. But South Carolina has not directly addressed this issue in the context of a crashworthiness case, and there is a split of authority in other jurisdictions. *Compare Kidron, Inc. v. Carmona*, 665 So. 2d 289, 292 (Fla. Dist. Ct. App. 1995), *Montag v. Honda Motor Co.*, 75 F.3d 1414, 1419 (10th Cir. 1996) (applying Colorado law), *and Dahl v. BMW*, 748 P.2d 77, 80-82 (Or. 1987), *with Reed v. Chrysler Corp.*, 494 N.W.2d 224, 229 (Iowa 1992), *and Andrews v. Harley Davidson, Inc.*, 796 P.2d 1092, 1095 (Nev. 1990). Although we cannot be certain what rule South Carolina would adopt, we cannot say that the district court erred in concluding that in light of the crashworthiness principle, the cause of the original accident was not relevant to proving a claim for enhanced injury.

In addition, because this case was brought by Jimenez as personal representative of young Sergio's Estate, Barrientos' negligent conduct might reasonably be ruled irrelevant. Under South Carolina law, the estate of a deceased may bring not only an action on behalf of the deceased, but also an action on behalf of specified heirs for wrongful death. *See* S.C. Code Ann. § 15-51-20. Thus, to the extent that Jimenez' suit was brought on behalf of young Sergio for his pain and suffering before death, Barrientos' negligent conduct would clearly not be relevant. And to the extent it was brought on behalf of heirs, the relevance cannot be demonstrated on this record. Perhaps Barrientos' wrongful death claim, if she has asserted it and retained it, would have to be reduced proportionately. *But cf. Hall v. United States*, 381 F. Supp. 224, 226 (D.S.C. 1974) (holding at a time when contributory negligence was a complete defense that only the contributory negligence of *all* the beneficiaries defeated an action for wrongful death). But whether she still has a claim or whether it could be adjusted in this action is not clear. We know that Barrientos is not a named party to this action and that the Estate sued her for her negligence and reached a settlement with her. At bottom, DaimlerChrysler had the burden of establishing the relevance of Barrientos' conduct to the Estate's claims against DaimlerChrysler, and we cannot say that the district court abused its discretion in ruling that DaimlerChrysler failed to carry this burden.

DaimlerChrysler argues that even if the evidence is not relevant to the determination of its liability for crashworthiness, the red light evi-

dence was nonetheless admissible on the issue of damages because it would have helped the jury assess how much of the parents' grief and marital break-up was attributable to DaimlerChrysler's negligence and how much was instead attributable to the parents' feelings of guilt or anger based on Barrientos' culpability for running the red light. While the evidence might have been admitted on this basis, the trial judge's finding that DaimlerChrysler failed to assert this reason for the evidence's admissibility at the time of the suppression motion appears to be correct. Therefore, we conclude again that the district court did not abuse its discretion in excluding the evidence. *See Price v. City of Charlotte*, 93 F.3d 1241, 1248-49 (4th Cir. 1996).

B

(This Part IV.B is not the opinion of the court but the dissenting opinion of Judge Niemeyer on Part IV.B.)

DaimlerChrysler also contends that the district court erroneously excluded evidence that young Sergio was not wearing his seatbelt at the time of the accident. It argues that even giving full recognition to South Carolina's limitation on the admissibility of seatbelt-use evidence, evidence of seatbelt usage was relevant in this case to several issues not covered by the South Carolina restriction and therefore should have been admitted. It argues particularly that young Sergio's failure to wear a seatbelt was relevant to the reasonableness of its safety system in the minivan, to causation, and to damages.

In *Keaton v. Pearson*, 358 S.E.2d 141, 141 (S.C. 1987), the South Carolina Supreme Court held that "in the absence of an affirmative statutory duty, a plaintiff's failure to use a seat belt does not constitute contributory negligence or a pre-injury failure to minimize damages." Shortly thereafter, South Carolina did enact a seatbelt statute that requires the driver and every occupant of a vehicle to wear a seatbelt. *See* S.C. Code Ann. § 56-5-6520. However, this statute, which provides that a "violation of this article does not constitute negligence per se or contributory negligence and is not admissible as evidence in a civil action," *id*. § 56-5-6540(C), did not apply to young Sergio in this case, as the parties conceded below that young Sergio "was not mandated by any affirmative statutory duty to wear a seatbelt because he fell under one of the exceptions to S.C. Code § 56-5-6530." J.A. 68.

The district court did permit Chrysler to "bring in evidence of the existence of seatbelts in the minivan's design and the actual presence of seatbelts in the Jimenez minivan for the purposes of proving crashworthiness," but it did not permit the introduction of evidence that young Sergio was not wearing his seatbelt at the time of the collision. J.A. 68. In this regard, the jury was clearly instructed that although "whether or not [young Sergio] was wearing a seat belt is irrelevant in this case," it should "consider seat belts only for the purpose of considering whether the minivan was equipped with seat belts and how they contributed to the crashworthiness of the Chrysler minivan." J.A. 1221, 1221-22. Chrysler contends that this exclusion of seatbelt-use evidence was reversible error because "[t]he jury may well have concluded that [Chrysler]'s design was not crashworthy precisely because the seatbelt, even if used, failed to prevent Sergio's death." Brief of Appellant at 36. But this was not DaimlerChrysler's theory at trial.

DaimlerChrysler's main defense at trial was that young Sergio was ejected through a window rather than through the open liftgate. And its principal argument to the jury as to why it should not be held liable focused not on the crashworthiness of the vehicle's design, but instead on whether the liftgate latch defect was the cause in fact of young Sergio's death. Furthermore, the district court instructed the jury, without objection, that in order to prevail on its negligence claim the Estate had to prove by a preponderance of the evidence: (1) that DaimlerChrysler was negligent in designing or manufacturing the latch; (2) that an injury occurred; and (3) that DaimlerChrysler's negligence proximately caused that injury. J.A. 1223. Similarly, in instructing the jury on the strict liability claim, the district court emphasized that "[t]he plaintiff . . . contends that, when the Dodge Caravan was placed on the market, it was in a defective condition and dangerous beyond the expectations of the ordinary consumer *because of the design of its rear door latch*." J.A. 1234 (emphasis added). Thus, given that the jury clearly believed the Estate's contentions both that young Sergio was ejected through the liftgate and that the rear door latch design was deficient, we are persuaded that the jury's finding of liability would have been the same had it been made clear that Sergio's belt was not buckled at the time of the collision. Accordingly, if the district court erred in excluding seatbelt-use evidence on issues of liability, we conclude it was harmless.

But DaimlerChrysler's arguments relating to the evidence's relevance to damages are persuasive. As the Estate concedes, "[because] in South Carolina a crashworthiness plaintiff is *never* entitled to any recovery except for *enhanced* injuries, the crashworthiness doctrine itself *always* apportions liability by exempting the manufacturer for responsibility for *all* injuries caused by the first collision." Brief of Appellee at 27. It follows that the jury may award only damages attributable to the "second collision," in this case, for injuries resulting from the defective liftgate latch. Accordingly, the jury was required to offset against young Sergio's overall damages those damages attributable to the injury caused by the first collision, i.e., those that would have resulted had young Sergio been thrown against the closed, non-defective rear liftgate instead of being ejected. To assess such damages accurately, the jury had to know whether young Sergio was wearing a seatbelt. If the jury believed he was wearing a seatbelt, it might properly have concluded that any injury suffered before the "second collision" was minimal, whereas if it believed young Sergio was not wearing a seatbelt, it might have reached a substantially different result, possibly concluding that injury from being thrown around the inside of the minivan was severe. Seatbelt usage thus was important to the determination of a core issue at trial — the jury's proper assessment of damages attributable to DaimlerChrysler's misconduct, as distinct from other causes. To compound this error, contrary to the conceded fact that young Sergio was not wearing a seatbelt, the Estate led the jury to believe that he was wearing a seatbelt.[4]

[4]During the Estate's opening statement to the jury, counsel for the Estate told the jury, "Maria went back as she does, saw that [young Sergio] *was clipped in his belt*, went up to her seat, buckled up, the mom got in and buckled up and they were off on the trip." J.A. 104 (emphasis added). At that point, counsel for DaimlerChrysler interrupted, and there followed long discussions with the court about the appropriate course of action. DaimlerChrysler asserted that a mistrial had to be declared. The district court refused to grant a mistrial and offered to provide a curative instruction. DaimlerChrysler argued that a curative instruction would only highlight the fact that young Sergio was thought to be wearing a seatbelt. It argued that the mistake could only be cured by telling the jury that in fact young Sergio was not wearing a seatbelt at the time of the accident. Admitting this evidence, however, would have been contrary to the district court's pretrial order excluding such evidence. As a consequence, the only information that the jury had was that at the time of the accident, young Sergio was wearing a seatbelt and that somehow he was thrown from the Caravan despite that fact.

South Carolina law does not limit the admission of seatbelt-use evidence for this purpose. It prohibits DaimlerChrysler from introducing seatbelt evidence to prove negligence by the party not wearing a seatbelt. *See Keaton*, 358 S.E.2d at 141. But DaimlerChrysler correctly points out that it was not seeking to admit evidence to prove that young Sergio was negligent. Rather, it was seeking to point out that even without the liftgate latch defect, young Sergio would have been thrown about the interior of the vehicle and injured and that DaimlerChrysler would not have been responsible for certain injuries that young Sergio would have suffered even in a vehicle that was equipped with a non-defective latch. DaimlerChrysler was thus entitled to have the jury determine the extent of young Sergio's injuries in the absence of the defect and credit any award against DaimlerChrysler with the amount of damages resulting solely from the original collision as opposed to the product defect. Therefore, the exclusion of this evidence in determining damages prevented DaimlerChrysler "from fully developing evidence relevant to a material issue" and therefore was not harmless error. *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

For these reasons, a new trial is necessary with respect to compensatory damages attributable to the Estate's claims for negligent design and strict liability.

## C

DaimlerChrysler next contends that the district court erred in excluding evidence that the Estate filed a wrongful death claim against Barrientos resulting in a $15,000 settlement. The district court excluded that evidence as irrelevant under the crashworthiness theory, and we do not find that ruling to be an abuse of discretion.

## D

Finally, DaimlerChrysler contends that the district court erred in admitting evidence of other accidents caused by the liftgate latch's overall weakness. Specifically, DaimlerChrysler asserts that these other accidents admitted into evidence were not "substantially similar" to this one, *see generally Buckman v. Bombardier Corp.*, 893 F. Supp. 547, 552 (E.D.N.C. 1995) (requiring "the alleged defect [to be]

similar" to that which caused other incidents sought to be introduced as evidence), because unlike these other incidents, the headless striker was the only part of the latch design alleged to be defective in this case. The Estate, on the other hand, contends that overall latch strength was also relevant to its theory of the latch's defect and that these other cases involved the strength of the latch. It asserts that its engineering expert testified that the overall weakness of the latch "contributed to its failure in the Jimenez minivan."

As we have noted in footnote 2, the Estate's expert focused his opinion on the absence of a head on the striker post. Indeed, he went so far as to say that had the head been on the striker post, the liftgate would not have opened. But the expert did point to weakness in the striker post causing it to bend "some." And he did not give an opinion, one way or the other, on whether a stronger striker post would have prevented the liftgate from opening even though it was headless.

While the better course in the circumstances might have been to exclude the evidence of other accidents until it was more clearly demonstrated that they were caused by a "substantially similar" defect, any error in admitting evidence of the other accidents was, in our judgment, harmless. This evidence was not so focused as to prove a particular negligent design, and the jury was presented with more particular evidence from which it could have concluded that Daimler-Chrysler's engineers were negligent in embarking on a latch design for a novel product without adequately taking into account certain types of potential safety risks. Moreover, faced with novel design problems, DaimlerChrysler failed to crash test its product to discover potential safety problems, as was its custom.

V

In sum, for the reasons given above, except in Part IV.B, and given in the separate opinion of Judge Luttig, in which Judge Williams joins, we reverse the jury's verdict finding liability for negligent misrepresentation; we reverse the jury's verdict finding facts to justify punitive damages and its award of punitive damages; and we vacate the judgment and remand for a new trial on negligent design and strict liability. We do not reach the other assignments of error made by DaimlerChrysler. In light of our rulings, these issues are either moot

or better left for resolution by the district court as an initial matter at the new trial.

*REVERSED IN PART AND VACATED AND*
*REMANDED FOR A PARTIAL NEW TRIAL*

LUTTIG, Circuit Judge, concurring and delivering the opinion for the court with respect to Part IV.B:

I am pleased to concur in all but Part IV.B. of Judge Niemeyer's opinion. However, with regard to the admissibility of the evidence proffered by DaimlerChrysler that Sergio was not wearing his seatbelt at the time of the accident, I would hold without hesitation that the district court abused its discretion in excluding such evidence under both South Carolina law and the Federal Rules of Evidence. I would also conclude that, in light of the statement by plaintiff's counsel during opening argument that Sergio was belted, the district court's erroneous evidentiary ruling was not harmless.

Under South Carolina law, "in the absence of an affirmative statutory duty, a plaintiff's failure to use a seat belt does not constitute contributory negligence or a pre-injury failure to minimize damages." *Keaton* v. *Pearson*, 358 S.E.2d 141, 141 (S.C. 1987). DaimlerChrysler offered evidence of Sergio's seatbelt non-use to establish, *inter alia*, that the Caravan was not unreasonably dangerous under South Carolina's crashworthiness doctrine and that the alleged defect in the latchgate was not the proximate cause of Sergio's injuries. Because DaimlerChrysler offered the evidence neither to show contributory negligence by Sergio nor a pre-injury failure to minimize damages, the district court erred when it concluded that "South Carolina [would hold] . . . that evidence of seatbelt usage is inadmissible respecting crashworthiness . . . ." J.A. 39.

Many states, like South Carolina, prohibit evidence of seatbelt non-use to establish contributory or comparative negligence or failure to mitigate damages. *See*, *e.g.*, Ark. Code Ann. § 27-37-703; Kan. Stat. Ann. § 8-2504(c); Mo. Rev. Stat. § 307.178.2; Virginia Code § 46.2-1094(D). Nevertheless, federal and state courts admit evidence of seatbelt non-use to determine whether an automobile was unreasonably dangerous for crashworthiness purposes, *even if* state law bars

such evidence to establish contributory negligence or failure to mitigate damages. *See Gardner* v. *Chrysler Corp.*, 89 F.3d 729, 737 (10th Cir. 1996) (admitting evidence of plaintiff's failure to use a seatbelt as to the issue of crashworthiness, *despite* Kansas statute prohibiting evidence of non-use to show comparative negligence or mitigation of damages); *Hermann* v. *General Motors Corp.*, 720 F.2d 414, 415 (5th Cir. 1983) (admitting evidence of plaintiff's non-use of seatbelt as to whether automobile was crashworthy, *despite* Louisiana law that failure to use seatbelts does not constitute contributory negligence); *Brown* v. *Ford Motor Co.*, 67 F. Supp. 2d 581, 587 (E.D. Va. 1999) ("[E]vidence of the failure to wear a seatbelt is admissible as it relates to the issues of negligent design and manufacture."); *General Motors Corp.* v. *Wolhar*, 686 A.2d 170, 176-77 (Del. 1996) (when plaintiff alleges that "enhanced injuries were proximately caused by a design defect in her vehicle, the defendants must be permitted to introduce seatbelt evidence for the limited purposes of establishing: the safety design of the vehicle as a whole; and, that the non-use of the seatbelt, rather than the vehicle's design, was the supervening cause of those enhanced injuries"); *Lowe* v. *Estate Motors Ltd.*, 410 N.W.2d 706, 707-08 (Mich. 1987) ("Evidence of the seat-restraint system goes to the heart of the issue in crashworthiness cases in which the plaintiff's injuries were sustained after being ejected from the vehicle, a result which seat belts are specifically designed to prevent.").

Moreover, courts have admitted evidence of seatbelt non-use to show proximate cause in crashworthiness cases, even when state law, like South Carolina, precludes such evidence to show contributory negligence or failure to mitigate damages. *See Wolhar*, 686 A.2d at 176-77, *MacDonald* v. *General Motors Corp.*, 784 F. Supp. 486 (M.D. Tenn. 1992) (allowing evidence of seatbelt non-use to demonstrate that plaintiffs' injuries arose from their failure to wear seatbelts rather than the alleged design defect, *despite* state statute barring such evidence to show contributory negligence); *LaHue* v. *General Motors Corp.*, 716 F. Supp. 407, 416 (W.D. Mo. 1989) (admitting evidence of seatbelt non-use on the issue of causation, *despite* state statute barring such evidence to show comparative negligence).

Although some state courts have prohibited evidence of seatbelt non-use in crashworthiness actions, *see Olson* v. *Ford Motor Co.*, 558 N.W.2d 491 (Minn. 1997), those states have broadly-worded statutes

that bar seatbelt evidence in any action involving personal injuries. *See*, *e.g.*, Minn. Stat. § 169.685. South Carolina has no such statute applicable under the circumstances of this case.* The only authority on this issue is *Keaton*, which prohibits evidence of seatbelt non-use only on the issues of "contributory negligence" or "a pre-injury failure to minimize damages." 358 S.E.2d at 141. Under the facts here, no South Carolina statute or case bars admission of seatbelt evidence in a crashworthiness case, except when the admission is for the purposes prohibited by *Keaton*.

Because South Carolina substantive law presents no barrier to the introduction of evidence of Sergio's failure to wear his seatbelt, the remaining question is whether, under the Federal Rules of Evidence, that evidence was relevant to show the crashworthiness of the minivan, or a lack of proximate cause between the alleged defect and Sergio's injury. Sergio's failure to wear his seatbelt is relevant to both issues.

In assessing crashworthiness, rather than focus on the allegedly defective part of the automobile, the jury must consider whether the vehicle was unreasonably dangerous *as a whole*. *See Dreisonstok* v. *Volkswagenwerk, A.G.*, 489 F.2d 1066 (4th Cir. 1974); *Melia* v. *Ford Motor Co.*, 534 F.2d 795, 800 (8th Cir. 1976); *La Hue*, 716 F. Supp. at 407 ("The design of individual components within this car need not be considered in a vacuum because safety features such as seat belts are a part of the overall design."). Evidence of seatbelt non-use is unquestionably admissible to show the reasonableness of the vehicle's overall design. The jury must know how an individual would be affected upon impact when all of the design features, including the seatbelt, are being used as intended. The use or non-use of a seatbelt by an occupant is relevant in determining whether a vehicle is "crash-worthy" since the latch and rear door were not the only mechanisms

---

*Although S.C. Code Ann. § 65-5-6540 would bar admission of seatbelt non-use into evidence under some circumstances, that statute is inapplicable here because the backseat of the vehicle in which Sergio was a passenger was not equipped with a shoulder harness. J.A. 425; *see* S.C. Code Ann. § 65-5-6530 ("The provisions of this article do not apply to: . . . (9) occupants of the back seat of a motor vehicle unless the vehicle is equipped with a shoulder harness in addition to the lap belt.").

designed to secure an occupant inside the vehicle. If Sergio's injuries could have been prevented if he had been wearing his seatbelt, then such evidence is indisputably relevant as to whether the Dodge Caravan is unsafe "as a whole." Even plaintiff's expert conceded that the latches function as part of a "total system" and that "protecting against ejection has to do with, of course, the seat belts." J.A. 396-97 (testimony of Mr. Elwell). To find otherwise would be antithetical to the holistic inquiry of a vehicle's safeness required in crashworthiness cases.

Such evidence is likewise relevant to damages since appellant conceded at trial that "had Sergio stayed inside the minivan, he would have sustained, if anything, minor injuries." J.A. 1092.

There can be no question that failure to admit the evidence of seatbelt non-use was prejudicial to DaimlerChrysler's case. Although the district court allowed DaimlerChrysler to introduce evidence that the Caravan included a seatbelt restraint system, by excluding evidence of Sergio's seatbelt non-use, the jury was essentially left to infer that the seatbelt itself may have failed and thus contributed to Sergio's death. And, of course, the prejudice was only compounded by the affirmative, mistaken representation to the jury by plaintiff's counsel that Sergio was seatbelted when in fact he was not.

We would undoubtedly reverse the district court if the tables were turned, that is, had the court refused the plaintiff's request to admit evidence that the deceased was wearing his seatbelt. And especially would we do so if, in the same trial, the defendant's counsel had stated to the jury that the deceased was not seatbelted when in fact he was. We would hold that the prejudice to the plaintiff, given these errors, was incontestable. Under law, no different result should obtain where, as here, the same errors in principle were committed to the prejudice of the defendant, rather than to that of the plaintiff.

I am authorized to represent that Judge Williams joins in this opinion.